

FILED
CLERK, U.S. DISTRICT COURT

JUN – 4 2007
6-4-07

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

✓ **Priority**
✓ **Send**
  **Clsd**
✓ **Enter**
✓ ~~PB/BY~~ JS-6
  **JS-2/JS-3**
  **Scan Only**

ENTERED
CLERK, U.S. DISTRICT COURT

JUN – 4 2007

CENTRAL DISTRICT OF CALIFORNIA
_____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CAROL BURNETT, an individual; WHACKO, INC., a California corporation, | Case No. CV 07-01723 DDP (RCx) |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | [Motion filed on April 27, 2007] |
| TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, | |
| Defendants. | |

This matter comes before the Court on Twentieth Century Fox Film Corporation's ("Fox") motions to dismiss for failure to state a claim and special motion to strike pursuant to California's Anti-SLAPP statute.  After reviewing the papers submitted by the parties, the Court grants the motion to dismiss, deny the special motion to strike as moot, and adopts the following order.

I.   **BACKGROUND**

Family Guy is a half-hour, animated, comedy television program broadcast on primetime and geared toward an adult audience. Compl.

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d)



1  ¶ 10.   The show borrows heavily from popular culture, following the
2  exploits of the Griffin family and friends in the fictional suburb
3  of Quahog, Rhode Island.   Id. ¶ 9. Family Guy routinely puts
4  cartoon versions of celebrities in awkward, ridiculous, and absurd
5  situations in order to lampoon and parody those public figures and
6  to poke fun at society's general fascination with celebrity and pop
7  culture.   See, e.g., Ex. A.

8        On or about April 23, 2006, Fox aired an episode of "Family
9  Guy" entitled "Peterotica."   Id., ¶ 10.   Near the beginning of the
10 episode, the Griffin family patriarch, Peter Griffin, an "Archie
11 Bunker"-like character, enters a porn shop with his friends.   Id.
12 ¶¶ 9, 10.   Upon entering, Peter remarks that the porn shop is
13 cleaner than he expected.   Id., ¶ 10; Ex. A.   One of Peter's
14 friends explains that "Carol Burnett works part time as a janitor."
15 Id.   The screen then switches for less than five seconds to an
16 animated figure resembling the "Charwoman" from the Carol Burnett
17 Show, mopping the floor next to seven "blow-up dolls," a rack of
18 "XXX" movies, and a curtained room with a sign above it reading
19 "Video Booths."   Id.   As the "Charwoman" mops, a "slightly altered
20 version of Carol's Theme from The Carol Burnett Show is playing."
21 Id. ¶ 10.   The scene switches back to Peter and his friends.   Id.
22 One of the friends remarks: "You know, when she tugged her ear at
23 the end of that show, she was really saying goodnight to her mom."
24 Id.; Ex. A.   Another friend responds, "I wonder what she tugged to
25 say goodnight to her dad," finishing with a comic's explanation,
26 "Oh!"   Id.

27       In response to this Family Guy clip, plaintiffs Carol Burnett
28 and Whacko, Inc., filed this suit against defendant Fox for: (1)

2

1  copyright infringement; (2) violation of the Lanham Act, 15 U.S.C.
2  § 1125; (3) violation of California's statutory right of publicity,
3  Civil Code § 3344; and (4) common law misappropriation of name and
4  likeness.  Defendant now moves to dismiss plaintiffs' claims.
5  Defendant also brings a special motion to strike Burnett's
6  supplemental state law (claims) under California's anti-SLAPP
7  statute, California Code of Civil Procedure § 425.16.

8

9  **II.   LEGAL STANDARD**

10      Dismissal under Rule 12(b)(6) is appropriate when it is clear
11  that no relief could be granted under any set of facts that could
12  be proven consistent with the allegations set forth in the
13  complaint.  <u>Newman v. Universal Pictures</u>, 813 F.2d 1519, 1521-22
14  (9th Cir. 1987).  The court must view all allegations in the
15  complaint in the light most favorable to the non-movant and must
16  accept all material allegations — as well as any reasonable
17  inferences to be drawn from them — as true.  <u>North Star Int'l v.</u>
18  <u>Arizona Corp. Comm'n</u>, 720 F.2d 578, 581 (9th Cir. 1983).

19      The scope of review on a motion to dismiss for failure to
20  state a claim is generally limited to the content of the complaint.
21  <u>Pegasus Holdings v. Veterinary Centers of America</u>, Inc., 38
22  F.Supp.2d 1158, 1159-60 (C.D. Cal. 1998).  The Court may, however,
23  consider exhibits submitted or referenced in the complaint and
24  matters that may be judicially noticed pursuant to Federal Rule of
25  Evidence 201.  <u>Id.</u>  Indeed, "documents specifically referred to in
26  a complaint, though not physically attached to the pleading, may be
27  considered where authenticity is unquestioned."  <u>Daly v. Viacom,</u>

28

1  <u>Inc.</u>, 238 F.Supp.2d 1118, 1121-22 (N.D. Cal. 2002) (considering
2  television program referenced in, but not attached to, complaint).
3        Leave to amend should not be granted where the complaint is
4  futile.   <u>In re Silicon Graphics, Inc. Sec. Litig.</u>, 183 F.3d 970,
5  991 (9th Cir. 1999).
6        Federal district courts may exercise supplemental jurisdiction
7  "over all other claims that are so related to claims in the action
8  within such original jurisdiction that they form part of the same
9  case or controversy . . . ."  28 U.S.C. § 1367(a).  Courts "may
10 decline to exercise supplemental jurisdiction over a claim under
11 subsection (a) if . . . (3) the district court has dismissed all
12 claims over which it has original jurisdiction . . . ."  28 U.S.C.
13 § 1367(c)(3).  <u>See also</u> <u>Ove</u>, 264 F.3d at 822 (upholding district
14 court's refusal to exercise supplemental jurisdiction over state
15 claims after dismissing federal claims, including dismissal of §
16 1983 claim for failure to state a claim).
17
18 **III. DISCUSSION**
19        A.   <u>Plaintiffs' First Claim for Relief</u>
20        Plaintiffs' first claim of relief alleges that Fox infringed
21 plaintiffs' copyrighted material.  Defendant contends that even
22 assuming *arguendo* that plaintiffs possess valid copyrights,
23 plaintiffs' first claim of relief is barred as a matter of law by
24 the doctrine of fair use.
25        The Copyright Act of 1976 protects the fair use of another's
26 copyrighted work:
27
28

4

1          ...[T]he fair use of a copyrighted work ... for purposes
         such as criticism [and] comment ... is not an
2          infringement of copyright.  In determining whether the
         use of a made work in any particular case is a fair use
3          the factors to be considered shall include:\
         (1)   the purpose and character of the use, including
4                whether such use is of a commercial nature or is for
               nonprofit educational purposes;
5          (2)   the nature of the copyrighted work;
         (3)   the amount and substantiality of the portion used in
6                relation to the copyrighted work as a whole; and
         (4)   the effect of the use on the potential market for or
7                value of the copyrighted work. ...

8 17 U.S.C. § 107.  The fair use doctrine calls for a "case-by-case

9 analysis."  Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577

10 (1994).  "The text [of 17 U.S.C. § 107] employs the terms

11 'including' and 'such as' in the preamble paragraph to indicate the

12 'illustrative and not limitative' function of the examples given."

13 Id.  Courts must consider and weigh all four factors.  Id.  The

14 Court may conduct a fair use analysis, as a matter of law, where

15 the facts are presumed or admitted.  See Harper & Row Publishers,

16 Inc. v. Nation Enters., 471 U.S. 539 (1985); see also Fisher v.

17 Dees, 794 F.2d 432, 435-36 (9th 1986)(finding fair use where the

18 material facts were not at issue or were admitted; judgments

19 pertaining to fair use "are legal in nature" and are to be made by

20 the court).

21

22        1.    The Purpose and Character of the Use

23      The first factor, the "purpose and character of the use,"

24 addresses "whether the new work merely 'supercedes the objects' of

25 the original creation, or instead adds something new, with a

26 further purpose or different character, altering the first with new

27 expression, meaning or message, in other words, whether and to what

28

1  extent the new work is 'transformative.'" <u>Campbell</u>, 510 U.S. at 579

2  (internal citations omitted).

3      Among the various forms of "transformative use" is that of

4  parody.  <u>See</u> <u>id.</u>  A parody is a "'literary or artistic work that

5  imitates the characteristic style of an author or a work for comic

6  effort or ridicule,' or as a 'composition in prose or verse in

7  which the characteristic turns of thought and phrase or class of

8  authors are imitated in such a way as to make them appear

9  ridiculous.'"  <u>Id.</u> at 580.  "[P]arody has an obvious claim to

10 transformative value" because "[l]ike less ostensibly humorous

11 forms of criticism, it can provide social benefit, by shedding

12 light on an earlier work, and, in the process, creating a new one."

13 <u>Id.</u> at 579.  "For purposes of copyright law, the nub of the

14 definitions, and the heart of any parodist's claim to quote from

15 existing material, is the use of some elements of a prior author'

16 composition to create a new one, that, at least in part, comments

17 on that author's works."  <u>Id.</u> at 580.

18     In <u>Campbell</u>, the Supreme Court found that hip-hop band 2-Live

19 Crew's rendition of "Pretty Woman" was a parody because it targeted

20 the original song and commented "on the naivete of the original of

21 an earlier day, as a rejection of its sentiment that ignores the

22 ugliness of street life and the debasement that it signifies."  <u>Id.</u>

23 at 583.  Relying on <u>Campbell</u> in <u>Mattel, Inc. v. Walking Mountain</u>

24 <u>Productions</u>, 353 F.3d 792, 802 (9th Cir. 2003), the Ninth Circuit

25 remarked: "No doubt, 2-Live Crew could have chosen another song to

26 make such a statement.  Parody only requires that 'the plaintiff's

27 copyrighted work is *at least in part the target* of the defendant's

28 satire,' not that the plaintiff's work be the irreplaceable object

6

1  for its form of social commentary." <u>Id.</u> (internal citations

2  omitted) (emphasis added).

3      In their opposition to the motion to dismiss, plaintiffs argue

4  that Family Guy's use of the Charwoman in the Peterotica episode

5  "does not constitute parody in the strict legal sense" and thus

6  cannot be considered "transformative." (Pls. Opp. at 7).   In

7  support of this argument, plaintiffs assert that the target of the

8  Family Guy parody was not the Charwoman character as such, but

9  Carol Burnett herself.   In fact, the Family Guy characters explain

10 that the porn shop is clean because "Carol Burnett works part-time

11 as a janitor" and make reference to Carol Burnett's signature ear

12 tug.   Plaintiffs point out that the Charwoman never tugged her ear

13 in The Carol Burnett Show; rather, Carol Burnett playing *herself*

14 tugged at her ear in the closing segment of the show as a salute to

15 her grandmother.   Furthermore, plaintiffs assert that the act of

16 placing the Charwoman in the role of a janitor in an erotic store

17 is neither "absurd" nor "transformative" because "one could easily

18 imagine a charwoman cleaning the floor of a porn shop." (Pls. Opp

19 at 8).

20     Secondarily, plaintiffs argue that a comparison of the Family

21 Guy's Charwoman and Burnett's Charwoman demonstrates that the

22 Family Guy version is virtually a literal copy of Burnett's, <u>see</u>

23 Denton Decl. ¶ 2; Exh. A, which is another indication that the use

24 of the Charwoman is not "sufficiently transformative." (Pls. Opp.

25 at 8).   In sum, the crux of plaintiffs' argument is that the target

26 of the "Family Guy's crude joke" appears to be Burnett, her family,

27 and her wholesome image as opposed to the Charwoman. (Pls. Opp. at

28 7).

1    However, as the Supreme Court has pointed out, the correct

2  inquiry is not whether the use of the material constitutes parody

3  in a "strict legal sense."  Rather, the "threshold question when

4  fair use is raised in defense of parody is whether a parodic

5  character may reasonably be perceived" and "[w]hether ... parody is

6  in good taste or bad taste does not and should not matter to fair

7  use."  See Campbell, 510 U.S. at 582.  As defendant correctly

8  notes, it is immaterial whether the target of Family Guy's "crude

9  joke" was Burnett, the Carol Burnett Show, the Charwoman, Carol's

10 Theme Music or all four.  The eighteen-second clip of the animated

11 figure resembling the "Charwoman," mopping the floor next to "blow-

12 up dolls," a rack of "XXX" movies, and "video booths" in a porn

13 shop is clearly designed to "imitate[] the characteristic style of

14 an author or a work for comic effort or ridicule," and is executed

15 in such a manner that "the characteristic turns of thought and

16 phrase or class of authors are imitated in such a way as to make

17 them appear ridiculous."  Campbell, 510 U.S. at 580; see also

18 Lucasfilm Ltd. v. Media Market Group, Ltd., 182 F.Supp.2d 897, 901

19 (N.D. Cal. 2002)(denying injunctive relief to block pornographic

20 version of "Star Wars" because a "parodic character may reasonably

21 be perceived").  Criticism of figures as universally recognized as

22 Carol Burnett "will not always be reasoned or moderate," and may

23 come in the form of "'vehement, caustic, and sometimes unpleasantly

24 sharp attacks."  Hustler Magazine v. Falwell, 485 U.S. 46, 51

25 (1988).  Here, Family Guy put a cartoon version of Carol

26 Burnett/the Charwoman in an awkward, ridiculous, crude, and absurd

27 situation in order to lampoon and parody her as a public figure.

28 Therefore, the Court finds that a parodic character may reasonably

1  be perceived in the Family Guy's use of the Charwoman because it is
2  a "literary or artistic work that broadly mimics an author's
3  characteristic style and holds it up to ridicule." See Dr. Seuss
4  Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1401
5  (9th Cir. 1997) (quoting American Heritage Dictionary definition of
6  parody).  The episode at issue put a cartoon version of Carol
7  Burnett/the Charwoman in an awkward, ridiculous, crude, and absurd
8  situation in order to lampoon and parody her as a public figure.
9  Accordingly, the Court finds this factor weighs in favor of fair
10 use.

11

12            2.    The Nature of the Copyrighted Work

13      The second § 107 factor is "the nature of the copyrighted
14 work."  This factor calls for recognition that some works are
15 closer to the core of intended copyright protection than others,
16 with the consequence that fair use is more difficult to establish
17 when the former works are copied. See Stewart v. Abend, 495 U.S.
18 207, 237-238 (1990) (contrasting fictional short story with factual
19 works); Harper & Row, 471 U.S. at 563-564 (contrasting
20 soon-to-be-published memoir with published speech); Sony Corp. of
21 America v. Universal City Studios, Inc., 464 U.S. 417, 455, n. 40
22 (1984) (contrasting motion pictures with news broadcasts); Feist
23 Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S.
24 340, 348-351 (1991) (contrasting creative works with bare factual
25 compilations); 3 M. Nimmer & D. Nimmer, Nimmer on Copyright §
26 13.05[A][2] (1993) (hereinafter Nimmer) However, as the Supreme
27 Court announced in Campbell, and both plaintiffs and defendant
28 recognize in their briefs, the second factor "is not much help in

                                  9

1 resolving ... parody cases, since parodies almost invariably copy

2 publicly known, expressive works...."  <u>Campbell</u>, 510 U.S. at 586.

3 Accordingly, the Court does not accord great weight here to the

4 second factor in the fair use analysis.

5

6      3.  <u>The Amount and Substantiality of the Amount Used</u>

7 The third factor asks whether "the amount and substantiality

8 of the portion used in relation to the copyrighted work as a

9 whole," § 107(3) ... are reasonable in relation to the purpose of

10 the copying.  <u>Campbell</u>, 510 U.S. at 586.  Here, attention turns to

11 "the persuasiveness of a parodist's justification for the

12 particular copying done, and the enquiry will harken back to the

13 first of the statutory factors, for, as in prior cases, [the

14 Supreme Court] recognize[d] that the extent of permissible copying

15 varies with the purpose and character of the use.... The facts

16 bearing on this factor will also tend to address the fourth, by

17 revealing the degree to which the parody may serve as a market

18 substitute for the original or potentially licensed derivatives."

19 <u>Id.</u>

20 In explaining the application of the third factor, the Court

21 in <u>Campbell</u>, stated that "[w]hen parody takes aim at a particular

22 original work, the parody must be able to "conjure up" at least

23 enough of that original to make the object of its critical wit

24 recognizable.... What makes for this recognition is quotation of

25 the original's most distinctive or memorable features, which the

26 parodist can be sure the audience will know. Once enough has been

27 taken to assure identification, how much more is reasonable will

28 depend, say, on the extent to which the song's overriding purpose

1  and character is to parody the original or, in contrast, the

2  likelihood that the parody may serve as a market substitute for the

3  original.  But using some characteristic features cannot be

4  avoided." Campbell, 510 U.S. at 588.  In relation to its

5  discussion of the third factor, the Court relied on Fisher v. Dees,

6  794 F.2d at 438-39 (9th Cir. 1986) and Elsmere Music, Inc. v. NBC,

7  623 F.2d 252, 253 (2d Cir. 1980).

8       In Elsmere, cast members of the comedy television program

9  "Saturday Night Live" sang an eighteen-second parody of "I Love New

10 York" using the words "I Love Sodom" repeated three times, and the

11 court found fair use, noting the brief use of the material and that

12 "the repetition of the copied material served both to ensure viewer

13 recognition and to satirize the frequent broadcasting of the

14 original." Elsmere, 623 F.2d at 253.  In Fisher, the Ninth Circuit

15 concluded that a twenty nine-second song parody on a forty-minute

16 comedy album, which copied the first bars of an underlying song

17 with parodic alterations to the opening lyrics, took "no more from

18 the original than necessary to accomplish reasonably its parodic

19 purpose." Fisher, 794 F.2d at 439.

20      Here, plaintiffs argue that Fox took more of the Charwoman

21 character's image and Carol's theme music than was necessary to

22 place that image in the minds of viewers.  Plaintiffs stress that

23 the Family Guy Charwoman is a "near verbatim copy of Burnett's

24 Charwoman" and analogize the present case to Walt Disney

25 Productions v. Air Pirates, 581 F.2d 751 (9th Cir. 1978), wherein

26 the panel concluded that it was not necessary, and hence not fair

27 use, for adult comic book authors to copy Disney characters in

28

1 their entirety to place the characters in the minds of their
2 readers.  Id. at 757-58.

3   This argument is unpersuasive.  The Charwoman, the Carol
4 Burnett Show theme music, and the jokes told about Burnett's family
5 appear on screen for approximately eighteen seconds.  As in
6 Elsmere, Fisher, and Campbell, Family Guy took "no more from the
7 original than necessary to accomplish reasonably its parodic
8 purpose."  Fisher, 794 F.2d at 439.  Although Family Guy could have
9 used more than just a "fleeting evocation," see Fisher, 794 F.2d at
10 439, and an "[e]ven more extensive use would still have been fair
11 use," Elsmere, 623 F.2d at 253, n.1, Family Guy "conjures up" the
12 "Charwoman" and "Carol's theme" for less than five seconds.
13 Compare Ex. A with Fisher, 794 F.2d at 439 (29-second song parody)
14 and Elsmere, 482 F.Supp. At 743-47 (18-second song parody).  As the
15 defendant correctly notes, there is no requirement that "parodists
16 take the *bare minimum* amount of copyright material necessary to
17 conjure up the original work."  Suntrust Bank, 268 F.3d 1257, 1273
18 (11th Cir. 2001)(emphasis added).  Here, Family Guy takes just
19 enough of the imagery and accompanying theme music to make this
20 crude depiction of the Charwoman character "recognizable" to
21 viewers.  Accordingly, the third factor weighs in favor of fair
22 use.

23

24     4. The Effect of the Use on the Potential Market
25   The fourth fair use factor is "the effect of the use upon the
26 potential market for or value of the copyrighted work."  17 U.S.C.
27 § 107(4).  This factor requires the Court to consider "the extent
28 of market harm caused by the particular actions of the alleged

1  infringer," as well as "'whether unrestricted and widespread
2  conduct of the sort engaged in by the defendant ... would result in
3  a substantially adverse impact on the potential market' for the
4  original." Campbell, 510 U.S. at 590.  This factor requires the
5  court to weigh "the benefit the public will derive if the use is
6  permitted [against] the personal gain the copyright owner will
7  receive if the use is denied." Dr. Seuss Enterprises, 109 F.3d at
8  1403.

9       In Fisher, the Ninth Circuit admonished that "[i]n assessing
10 the economic effect of the parody, the parody's critical impact
11 must be excluded.  Through its critical function, a 'parody may
12 quite legitimately aim at garroting the original, destroying it
13 commercially as well as artistically.' Copyright law is not
14 designed to stifle critics." Fisher, 794 F.2d at 436.  The Ninth
15 Circuit clarified the inquiry in parody cases as being "not its
16 potential to destroy or diminish the market for the original..."
17 but rather its potential to fulfill "the demand for the original."
18 Id.  The panel held that "infringement occurs when a parody
19 supplants the original in markets the original is aimed at, or in
20 which the original is, or has reasonable potential to become,
21 commercially valuable." Id.

22      In Fisher, the Ninth Circuit found that the danger of
23 commercial substitution was unlikely where defendants created a
24 twenty nine-second recording concerning a woman who sniffs glue,
25 which parodied the famous jazz standard "When Sunny Gets Blue," a
26 lyrical song concerning a woman's feelings about lost love.  In
27 holding that the parody had no cognizable economic effect on the
28 original, the Court stated it was unconvinced that "consumers

1  desirous of hearing a romantic and nostalgic ballad such as the

2  composers' song would be satisfied to purchase the parody instead."

3  Furthermore, "those fond of parody" were not "likely to consider

4  'When Sunny Gets Blue' a source of satisfaction." Id.

5      Here, as in Fisher, the Court finds that commercial

6  substitution is not likely in this case.  Defendant is correct that

7  the market demand for a non-parodic use of the Charwoman would not

8  be fulfilled by a use that has the character in front of "blow-up"

9  dolls and "XXX movies."  Arguing that the fourth factors weighs

10 against fair use, plaintiffs raise the issue that the Family Guy's

11 use of the Charwoman inflicts harm on the good will and reputation

12 associated with the copyrighted work.  However, a "parody may quite

13 legitimately aim at garroting the original, destroying it

14 commercially as well as artistically." Id.  Indeed,

15 "'[d]estructive' parodies play an important role in social and

16 literary criticism and thus merit protection even though they may

17 discourage or discredit an original author." Id.

18     Accordingly, the Court finds that the four factors of § 107

19 weigh strongly in favor of a finding of fair use and that

20 plaintiffs' first claim of relief for copyright infringement should

21 be dismissed without leave to amend.  Ordinarily, "[d]ismissal

22 without leave to amend is improper unless it is clear that the

23 complaint could not be saved by any amendment." Polich v.

24 Burlington Northern, Inc.,

25 942 F.2d 1467, 1472 (9th Cir. 1991).  However, leave to amend

26 should not be granted when plaintiffs could not allege any

27 additional facts which might cure defects in the complaint. See In

28 re VeriFone Sec. Litig., 11 F.3d 865, 872 (9th Cir.1993) (denying

1    leave to amend when plaintiffs failed to allege additional facts

2    which might cure defects in complaint).  Here, it is clear that the

3    complaint can not be saved by any amendment.  <u>See</u> <u>Polich</u>, 942 F.2d

4    at 1472; <u>see also</u> <u>In re Silicon Graphics</u>, 183 F.3d at 991 (9th Cir.

5    1999) (leave to amend should not be granted where the complaint is

6    futile).  Accordingly, the Court grants defendant's motion to

7    dismiss plaintiffs' first claim for relief without leave to amend.

8

9         B.   <u>Plaintiffs' Second Claim for Relief</u>

10        Plaintiffs' second claim for relief for violation of the

11   Lanham Act, 15 U.S.C. § 1125, alleges that defendant's use of the

12   Charwoman is "likely to cause confusion, or to cause mistake, or to

13   deceive the public as to the affiliation, connection, or

14   association of Ms. Burnett with Fox or the 'Family Guy' program, or

15   is likely to cause confusion as to the origin, sponsorship, or

16   approval of the 'Family Guy' program, and such use by Fox has

17   caused dilution of the distinctive quality of the "Charwoman" mark.

18   Compl., ¶ 20.  Defendant urges the Court to dismiss this claim on

19   several grounds.  The Court grants defendant's motion to dismiss

20   plaintiffs' second claim for relief both because it finds no

21   likelihood that viewers would be confused by defendant's use of the

22   Charwoman character and because defendant's parodic work is

23   considered noncommercial speech and, therefore, not subject to any

24   trademark dilution claim.

25

26        I.   <u>Likelihood of Confusion</u>

27        A trademark claim exists under the Lanham Act " 'where the

28   public interest in avoiding consumer confusions outweighs the

15

1  public interest in free expression."' <u>Mattel</u>, 353 F.3d at 807

2  (quoting <u>Rodgers v. Grimaldi</u>, 875 F.2d 994, 999 (2d Cir. 1989))

3  Some parodies will constitute an infringement, some will not.   "But

4  the cry of 'parody!' does not magically fend off otherwise

5  legitimate claims of trademark infringement or dilution.   There are

6  confusing parodies and non-confusing parodies.   All they have in

7  common is an attempt at humor through the use of someone else's

8  trademark."  4 J. Thomas McCarthy, McCarthy on Trademarks and

9  Unfair Competition § 31:153 (2007).   A non-infringing parody is

10 merely amusing, not confusing.  <u>Dr. Seuss Enterprises</u>, 109 F.3d at

11 1394.

12      "Where a defendant uses a variation on plaintiff's mark merely

13 to make a clever turn of a phrase, resolution of the likely

14 confusion issue may be quite different.   If the difference in

15 wording or appearance of the designation together with the context

16 and overall setting is such as to convey to the ordinary viewer

17 that this is a joke, not the real thing, then confusion as to

18 source, sponsorship, affiliation or connection is unlikely."  <u>See</u>

19 McCarthy at § 31:153.   Furthermore, the more distasteful and

20 bizarre the parody, the less likely the public is to mistakenly

21 think that the trademark owner has sponsored or approved it:

22
        Indeed, the more outrageous and offensive the parody, the less
23      likely confusion will result. …. [T]rademark owners, like
        public figures, who seek the public spotlight must accept the
24      concomitant risk of public ridicule in the form of parody.

25 M.K. Cantwell, <u>Confusion, Dilution and Speech: First Amendment</u>

26 <u>Limitations on the Trademark Estate: An Update</u>, 94 Trademark Rptr.

27 547, 582-583 (2004); <u>see</u> <u>Universal City Studios, Inc. v. Nintendo</u>

28 <u>Co.</u>, 746 F.2d 112, 223 U.S.P.Q. 1000 (2d Cir. 1984) (holding no

1 likely confusion between defendant's "comical, farcical, childlike

2 and nonsexual" DONKEY KONG video game character and plaintiff's

3 famous movie character KING KONG, who was "a ferocious gorilla in

4 quest of a beautiful woman"; court observed that "the fact that

5 DONKEY KONG so obviously parodies the KING KONG theme strongly

6 contributes to dispelling confusion on the part of consumers");

7 <u>Universal City Studios v. Casey & Casey</u>, 622 F. Supp. 201, 228

8 U.S.P.Q. 195 (S.D. Fla. 1985), aff'd without op., 792 F.2d 1125

9 (11th Cir. 1986) (no preliminary injunction against merchandise

10 showing two cartoon mice characters identified as MIAMI MICE, as

11 not likely to cause confusion with television series MIAMI VICE);

12 <u>Universal City Studios v. T-Shirt Gallery</u>, 634 F. Supp. 1468, 230

13 U.S.P.Q. 23 (S.D.N.Y. 1986) (strength of the parody "highlights the

14 differences" and "should dispel any confusion"); See <u>Lucasfilm Ltd.</u>

15 <u>v. Media Market Group, Ltd.</u>, 182 F. Supp. 2d 897, 179 A.L.R. Fed.

16 659 (N.D. Cal. 2002) (animated pornographic movie entitled

17 STARBALLZ found to be a parody of STAR WARS movies and not in

18 violation of the federal anti-dilution laws. "Parody is a form of

19 non-commercial, protected speech which is not affected by the

20 Federal Trademark Dilution Act."); <u>Mattel</u>, 353 F.3d 792 (9th Cir.

21 2003), on remand to, 2004 Copr. L. Dec. P 28824, 2004 WL 1454100

22 (C.D. Cal. 2004) (Artistic photographs parodying BARBIE doll in

23 incongruous situations are neither dilution nor trademark

24 infringement of the word mark BARBIE or the doll trade dress. "Any

25 reasonable consumer would realize the critical nature of this

26 [accused] work and its lack of affiliation with Mattel. Critical

27 works are much less likely to have a perceived affiliation with the

28 original work.").

17

1     The Court finds that defendant's use of the Charwoman

2  character in this case creates no likelihood of confusion.  Family

3  Guy is a cartoon comedy show known for its lampooning of

4  celebrities and pop culture.  The eighteen second clip featuring

5  the Charwoman can be fairly classified as distasteful and bizarre,

6  even outrageous and offensive.  However, the nature of the use does

7  not explicitly mislead the viewer as to affiliation, connection,

8  association with, or sponsorship or approval by plaintiffs.  As the

9  Ninth Circuit stated in <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d

10  894, 903 (9th Cir. 2002):

11

12     If we see a painting titled 'Campbell's Chicken Noodle Soup,'
       we're unlikely to believe that Campbell's has branched into
13     the art business. Nor, upon hearing Janis Joplin croon 'Oh
       Lord, won't you buy me a Mercedes-Benz?,' would we suspect
14     that she and the carmaker had entered into a joint venture....
       [M]ost consumers are well aware that they cannot judge a book
15     solely by its title any more than by its cover."

16  <u>MCA</u>, 296 F.3d at 900.  Likewise, in this case, no reasonable viewer

17  would mistake the Charwoman or Carol Burnett as anything other than

18  the target of a Family Guy parody.  Accordingly, the Court grants

19  defendant's motion to dismiss the second claim for relief with

20  respect to the likelihood of confusion claim.

21

22           ii.  <u>Trademark Dilution</u>

23     Plaintiffs' second claim for relief also alleges that Fox's

24  use of the Charwoman character "has caused dilution of the

25  distinctive quality of the 'Charwoman' mark."  Compl., ¶ 20.

26     Dilution may occur where use of a trademark "whittle[s] away

27  ... the value of a trademark" by "blurring their uniqueness and

28  singularity" or by "tarnishing them with negative associations."

18

1   MCA, 296 F.3d at 903 (internal citations omitted).  However,

2   "[t]arnishment caused merely by an editorial or artistic parody

3   which satirizes plaintiff's product or its image is not actionable

4   under an anti-dilution statute because of the free speech

5   protections of the First Amendment...." 4 McCarthy, supra, §

6   24:105, at 24-225.  A dilution action only applies to purely

7   commercial speech.  MCA, 296 F.3d at 904.  Parody is a form of

8   noncommercial expression if it does more than propose a commercial

9   transaction.  See id. at 906.  Under MCA, Fox's artistic and

10  parodic work is considered noncommercial speech and, therefore, not

11  subject to a trademark dilution claim.

12       Accordingly, the Court grants defendant's motion to dismiss

13  without leave to amend as to plaintiffs' second claim for relief

14  under the Lanham Act.

15

16       C.   Plaintiffs' State Law Claims for Relief

17       Plaintiffs' also bring a third claim for relief alleging

18  violation of California's statutory right of publicity, Civil Code

19  § 3344 and a fourth claim for relief for common law

20  misappropriation of name and likeness.

21       In addition to their motion to dismiss for failure to state a

22  claim upon which relief can be granted, defendant has also filed a

23  special motion to strike plaintiffs' state law claims for relief

24  under California's anti-SLAPP statute, Code of Civil Procedure §

25  425.16.

26       As discussed above, the Court dismisses plaintiffs' first and

27  second claims for relief without leave to amend.  Without these

28  federal claims, there is no federal subject matter jurisdiction.

19

1 Federal district courts may exercise supplemental jurisdiction
2 "over all other claims that are so related to claims in the action
3 within such original jurisdiction that they form part of the same
4 case or controversy . . . ."  28 U.S.C. § 1367(a).  Courts "may
5 decline to exercise supplemental jurisdiction over a claim under
6 subsection (a) if . . . (3) the district court has dismissed all
7 claims over which it has original jurisdiction . . . ."  28 U.S.C.
8 § 1367(c)(3).  See also Ove, 264 F.3d at 822 (upholding district
9 court's refusal to exercise supplemental jurisdiction over state
10 claims after dismissing federal claims, including dismissal of §
11 1983 claim for failure to state a claim).  Accordingly, this Court
12 declines to exercise supplemental jurisdiction pursuant to 28
13 U.S.C. 1367(c)(3) over the two remaining state law claims.  They
14 are, therefore, dismissed and defendant's special motion to strike
15 is denied as moot.
16
17 **III. CONCLUSION**
18     Carol Burnett is an icon in American culture as is her
19 character the "Charwoman."  The Court has no doubt that she is, and
20 rightly so, well known, respected, and beloved by a large segment
21 of the American public based upon her persona and her outstandingly
22 successful entertainment career.  The Court fully appreciates how
23 distasteful and offensive the segment is to Ms. Burnett.  Debasing
24 the "Charwoman" and also making Ms. Burnett's parents participants
25 in a crude joke is understandably disheartening to Ms. Burnett, her
26 family, and many fans.  To some extent this dispute is indicative
27 of just how far the "new media" has come from the "old media."  The
28 old media harkens back to days when crude jokes and insensitive,

20

1  often mean spirited, programing was perhaps found in live night

2  club performances but was not present on television.  In the new

3  media, any self imposed restraint essentially has been eliminated.

4  Public figures, such as Ms. Burnett, are frequent targets of

5  parodies and crude innuendo.  As Ms. Burnett well knows, it takes

6  far more creative talent to create a character such as the

7  "Charwoman" than to use such characters in a crude parody.  Perhaps

8  Ms. Burnett can take some solace in that fact.

9      However, the law, as it must in an open society, provides

10  broad protection for the defendant's segment.  Therefore, the Court

11  grants defendant's motion to dismiss plaintiff's complaint without

12  leave to amend.  The Court further denies defendant's special

13  motion to strike as moot.

14

15  IT IS SO ORDERED.

16

17  Dated:  6-1-07

18                          DEAN D. PREGERSON
                            United States District Judge
19

20

21

22

23

24

25

26

27

28